## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **REYNOLDS PACKAGING** | : | |
| **KAMA, INC., f/k/a ALCOA** | : | |
| **KAMA INC.,** | : | **Civil Action No. 3:08-CV-1902** |
| | : | |
| **Plaintiff** | : | **(Judge Munley)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **INLINE PLASTICS CORP.** | : | |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

## I.     INTRODUCTION

Reynolds Packaging KAMA, Inc. ("Plaintiff" or "Reynolds") brought this

suit on October 15, 2008, against Inline Plastics Corporation ("Defendant" or

"Inline") in order to recover unpaid amounts claimed to be due and owing under a

long-term supply agreement between the parties.  Specifically, Inline was a long-

term customer of Reynolds, having purchased oriented polysterene sheet ("OPS")

and polyethylene terephthalate sheet ("PET") from Reynolds, pursuant to supply

agreements, for approximately 20 years.  Now pending before the Court is

Reynolds's motion for summary judgment on its claims that Inline owes it nearly

$3 million in unpaid receivables that were incurred over the course of several

years, and which arose out of one or more supply agreements.  The parties course

of commercial dealings is summarized below. The motion is fully briefed and ripe for disposition. For the reasons that follow, it is recommended that Reynolds's motion be granted with respect to its contract claim, and that it be denied with respect to Inline's counterclaim.

## II.    FACTUAL BACKGROUND

On or about September 1, 2003, Reynolds and Inline entered into a supply agreement (the "2003 Supply Agreement"), pursuant to which Reynolds agreed to sell and Inline agreed to purchase OPS and PET products. In or around the middle of 2006, Inlines Plastics owed Reynolds approximately $6 million pursuant to certain purchase obligations. Reynolds maintains that these amounts were incurred under the 2003 Supply Agreement. For its part, Inline acknowledges that a debt of between $5-$6 million existed around that time, but denies that the debt was incurred under the 2003 Supply Agreement. To the contrary, Inline avers that it fulfilled entirely its purchase obligations under the 2003 Supply Agreement. Regardless of this disagreement, however, there is no dispute that by the middle of 2006, Inline owed Reynolds nearly $6 million for OPS and PET products that Reynolds had previously furnished to Inline.

Notwithstanding Inline's outstanding indebtedness, the parties continued their business relationship. On or about July 1, 2006, the parties entered into a

new two-year supply agreement (the "2006 Supply Agreement"). To address

Inline's outstanding debt, the 2006 Supply Agreement contained a provision

intended to help Inline pay down the debt incrementally by including an upcharge

on new product purchased each quarter. (2006 Supply Agreement ¶ 5.)

Specifically, this provision, which forms the cornerstone of this case, provided as

follows:

> To bring [Inline's] account current, [Inline] will pay
> [Reynolds], quarterly, an additional $.03 per pound for all
> pounds of Product purchased during each quarter . . . This
> payment will be applied to the outstanding receivables on
> [Inline's] account.

(2006 Supply Agreement ¶ 5.) The 2006 Supply Agreement expired pursuant to

its terms on June 30, 2008. Notwithstanding the parties' continued dealings and

the additional payments that Inline made to Reynolds under the terms of the 2006

Supply Agreement, it is undisputed that Inline remained indebted to Reynolds by

more than $5.8 million at the time the agreement expired.[1]

Despite this remaining indebtedness, and despite the fact that the parties did

---

[1] It is also undisputed – and obvious – that the terms of the repayment provision were not themselves sufficient to have allowed Inline to satisfy its indebtedness by the expiration of the 2006 Supply Agreement. Inline places considerable weight on this fact to support its contention that the repayment provision must have been intended to continue in effect after the 2006 Supply Agreement expired, but we do not find this fact is ultimately relevant to an interpretation of the contract's meaning.

not enter into a new long-term supply agreement upon the expiration of the 2006 Supply Agreement, Inline continued to purchase product from Reynolds as it transitioned to a new supplier. These sales were not made pursuant to a formal written contract, but instead appear to have been periodic or spot sales based upon Inline's anticipated business needs during its transition. On or about October 8, 2008, Reynolds informed Inline that it would not supply any additional product after October 10, 2008.

## III.  **PROCEDURAL HISTORY**

Soon after cutting off Inline's supply, Reynolds sued Inline in this Court on October 15, 2008, seeking damages for breach of contract, as well as under equitable theories for unjust enrichment and promissory estoppel.

Inline answered the complaint on December 12, 2008, and included a counterclaim alleging its own breach of contract claim. Inline's contract claim is predicated upon its assertion that the parties' course of dealing and communications following expiration of the 2006 Supply Agreement were sufficient to create a contract obligating Reynolds to supply product to Inline through January 2009. Inline contends that by abruptly refusing to supply Inline with any product after October 10, 2008, Reynolds impaired Inline's ability to fill its customer orders and that it has sustained consequential damages as a result.

4

On January 15, 2009, Inline sought leave of Court to continue to make quarterly payments into escrow in the amount of $260,000 – an amount Inline calculated as "the approximate amount of previous quarterly payments." (Doc. No. 15.) The Court denied this request, and instead directed that Inline pay directly to Reynolds its January 8, 2009 quarterly payment, finding that there was no dispute that this amount was past due. (Doc. 23.) The Court's order was silent with respect to future payments, presumably because the principle dispute in this case is whether Inline's acknowledged indebtedness is immediately due and payable or whether it can be paid off over time by way of interest-free, quarterly payments.

On April 29, 2009, prior to the close of fact discovery, Reynolds moved for summary judgment. (Doc. No. 28.) The motion was fully briefed and ripe for disposition as of June 5, 2009. While the motion remained pending, the parties continued to engage in fact discovery. On October 2, 2009, the Court entered an order granting Inline's request for leave to file a sur-reply, which thereafter was filed on October 5, 2009.

Following this briefing, the Court convened a conference with the parties to discuss the claims and the pending motion, and to explore preliminarily with the parties the possibility of mediation or settlement. Following this conference, the

parties engaged in tentative negotiations but they were unsuccessful, and the

parties thereafter notified the Court that no further settlement talks were deemed

warranted. Accordingly, the time has come for the Court to adjudicate

Defendant's motion for summary judgment on both its claims and on Plaintiff's

counterclaims.

IV. <u>STANDARD OF REVIEW</u>

Reynolds has moved for summary judgment pursuant to Rule 56(c)of the

Federal Rules of Civil Procedure, which provides that "[t]he judgment sought

should be rendered if the pleadings, the discovery and disclosure materials on file,

and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The substantive law identifies which facts are material, and "[o]nly disputes over

facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if

there is a sufficient evidentiary basis that would allow a reasonable fact finder to

return a verdict for the non-moving party. <u>Id.</u> at 248-49.

The moving party has the initial burden of identifying evidence that it

believes shows an absence of a genuine issue of material fact. <u>Conoshenti v. Pub.</u>

Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving

party has shown that there is an absence of evidence to support the nonmoving

party's claims, "the non-moving party must rebut the motion with facts in the

record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d

195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324

(1986).  If the nonmoving party "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at

322.  Summary judgment is also appropriate if the non-moving party provides

merely colorable, conclusory, or speculative evidence.  Anderson, 477 U.S. at 249.

There must be more than a scintilla of evidence supporting the nonmoving party

and more than some metaphysical doubt as to the material facts.  Id. at 252; see

also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In making this determination, the Court must "consider all evidence in the light

most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs.,

486 F.3d 791, 794 (3d Cir. 2007).

## V.     DISCUSSION

### A.     Reynolds's Contract Claim

Reynolds characterizes this case as "a collection action, pure and simple." (Doc. 33, at 1.)  Reynolds notes that there is no dispute that Inline owes Reynolds a considerable sum of money arising out of purchase obligations under one or more supply agreements, and Reynolds insists that the terms of the 2006 Supply Agreement are unambiguous and that there is simply no basis for the Court to interpret the agreement to allow Inline to continue to pay down its debts quarterly, based upon some vague average of past purchase amounts, and based upon Inline's own asserted interpretation of the contract's terms, which Reynolds contends flies in the face of the contract's plain language.[2]  At bottom, Reynolds urges the Court to consider the express language of the contract, and argues that Inline's arguments rely upon a fabrication of ambiguity that would allow the Court

---

[2]  The parties appear to dispute whether Inline's obligations under the 2003 Supply Agreement were entirely discharged at the time they entered into the 2006 Supply Agreement. Inline contends that it satisfied its obligations under this agreement and that its outstanding indebtedness arose outside of the 2003 Supply Agreement.  As will become clear, even assuming that Inline's position is correct with respect to when its debt arose, we do not find that the terms of the 2006 Supply Agreement admit of the ambiguities that Inline insists upon, and the 2006 Supply Agreement does not provide for an open-ended repayment plan after the contract's termination on June 30, 2008.  Instead, we find that the 2006 Supply Agreement is not ambiguous, and that Inline's efforts to have this Court consider parol evidence to interpret the parties' respective obligations under the agreement is unwarranted and, indeed, improper under governing Pennsylvania contract law.

to take evidence in order to resolve it, which Reynolds contends is improper given that the terms of the parties' agreement are unambiguous and must govern.

In marked contrast, Inline maintains that "this case is almost entirely, a factual dispute." (Br. in Opposition, at 8.) Inline insists that resolution of factually-dependent issues such as the timing and amount of orders and payments, the commercial and factual context in which the balance arose, and – most importantly – the intent and agreement of the parties, govern resolution of this matter and must be presented to a factfinder at trial.

The law governing the interpretation of contracts under Pennsylvania law is familiar and well-settled. "When a written contract is clear and unequivocal, its meaning must be determined by its contents alone." Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1010 (3d Cir. 1980) (citation omitted); Mace v. Atl. Ref. & Mktg. Corp., 785 A.2d 491, 496 (Pa. 2001). A contract is ambiguous if it is reasonably susceptible to different constructions and capable of being understood in more than one sense. St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991). Under Pennsylvania law, ambiguous contracts are interpreted by the trier of fact, and unambiguous contracts are interpreted by the court as a matter of law. Mellon Bank, 619 F.2d at 1011 n.10.

The United States Court of Appeals for the Third Circuit has recently had

occasion to summarize Pennsylvania law regarding the interpretation of

contractual language and terms:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. ***Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties.*** A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 243 (3d Cir. 2008) (internal

citation omitted) (citing Murphy v. Duquesne Univ., 777 A.2d 418, 429-30 (Pa.

2001)) (emphasis added).  Furthermore, it is hornbook law that courts must,

whenever possible, read contract provisions so as to avoid ambiguity.  Id. at 247.

Where a contract is not ambiguous, but is instead subject to only one reasonable

10

interpretation, it is appropriate for a district court to resolve the issue of interpretation on summary judgment. See Norfolk S. Ry. v. Reading Blue Mountain & N. Ry., 346 F. Supp. 2d 720, 725 (M.D. Pa. 2004) ("A court may grant summary judgment on the interpretation of a contract when the contract is susceptible to only one reasonable interpretation . . . When the terms of the contract are unambiguous, the express language of the agreement controls its meaning.").

At the outset, it is worth noting again that there is no dispute between the parties that Inline remains indebted to Reynolds for a substantial sum arising from the parties' commercial dealings.[3]  It is also undisputed that the 2006 Supply Agreement – on which the resolution of Reynolds's claims depends – is enforceable.[4]  The issue presented is straightforward:  Reynolds claims that the 2006 Supply Agreement expired pursuant to its terms as of June 30, 2008, and none of the terms of that agreement continue to have any continuing application. Accordingly, Reynolds claims that Inline's outstanding debt is due and payable immediately and nothing that may have been contained in the 2006 Supply

---

[3]  In its sur-reply, Inline asserted that its outstanding indebtedness to Reynolds stood at $1,679,642.81 as of October 2, 2009.  (Doc. 55, at 2 n.1.)

[4]  See Doc. 55, at 3 n.1 ("the enforceability of the 2006 Supply Agreement is undisputed . . .").

Agreement has any continuing effect with respect to Inline's payment of this debt. In contrast, Inline asserts that it bargained for the right to continue to make quarterly payments on its debt in accordance with the pay-down terms set forth in the 2006 Supply Agreement, and that this particular repayment provision continues to govern its repayment obligations notwithstanding the fact that the contract has expired.

For all its insistence about the ambiguity that Inline claims to exist in paragraph 5 of the 2006 Supply Agreement, Inline never explains what about the language the parties used is actually ambiguous. Again, the language of that paragraph provides as follows:

> To bring [Inline's] account current, [Inline] will pay [Reynolds], quarterly, an additional $.03 per pound for all pounds of Product purchased during each quarter . . . This payment will be applied to the outstanding receivables on [Inline's] account.

(2006 Supply Agreement, ¶ 5.)

In our view this language simply describes one means by which the parties during the life of the contract could work together to reduce Inline's substantial indebtedness. It cannot, however, be read as defining the sole and exclusive means of repayment, as suggested by Inline. The Court finds that this language is not reasonably capable of the interpretation urged by Inline and nothing in this

language is capable of reasonably being interpreted to mean that the terms of the repayment provision somehow extended beyond the termination of the supply agreement itself, and Inline fails to explain how the language itself could conceivably be read to mean otherwise. Furthermore, absolutely nothing in this language even suggests that Inline had somehow bargained for the right to pay off whatever existing debt that may have existed upon the expiration of the 2006 Supply Agreement pursuant to the quarterly payments made during the period that the agreement was effective. Inline simply cannot point to any language that actually exists within the four corners of an unambiguously written provision to support its interpretation of what the contract provided for.

Indeed, Inline's strained interpretation of this agreement runs afoul of settled principles of Pennsylvania contract law, which recognize that merely arguing differing interpretations of an agreement does not, by itself, create a contractual ambiguity justifying resort to parol evidence. Quite the contrary, for a party to successfully argue that a contract is sufficiently ambiguous to require parol evidence, that party must advance an alternate meaning of the contract which is commercially reasonable. See County of Mercer v. Unilect Corp., 612 F.Supp.2d. 638, 649 (W.D. Pa. 2009)(collecting cases).

Inline's various interpretations of the agreement fail to meet this standard,

since they present a commercially unreasonable view of this business relationship.

Under Inline's interpretation, paragraph 5 is not merely a supplemental means of

reducing  an outstanding $3 million debt; it constitutes the sole means by which

Reynolds may secure repayment of this debt in a timely fashion. If we accepted

Inline's interpretation it would mean that Inline could unilaterally decide when,

how, and how much it would pay Reynolds simply be deciding whether, when and

to what extent it would buy new products from Reynolds. Indeed, the logical

extension of Inline's interpretation, which suggests that this language defines the

sole means of contract repayment, would be that Inline could decide to

acknowledge the debt, but never repay it and Reynolds would be powerless to

collect the debt except as provided under paragraph 5. This interpretation is

plainly unreasonable and cannot be relied upon to argue that there is an ambiguity

in this agreement.[5]

Instead of focusing on the language itself, as the law directs, Inline offers a

variety of extrinsic parol evidence in an effort to create the appearance of an

---

[5] Indeed, we note that Inline's conduct in this case implicitly acknowledges the unreasonableness of the contract interpretation it urges on the court. As we have noted, in the course of this litigation Inline has made periodic $260,000 payments to Reynolds, based on its speculative theory that this amount would be equal the amount that it would have owed Reynolds under paragraph 5 if it had been buying goods from Reynolds. Nothing in the strained interpretation of the agreement pressed by Inline would call for such payments, but Inline doubtless recognizes that the failure to makes any payments, which is the logical extension of its legal argument, makes no commercial sense.

ambiguity. Inline's conclusory argument is evident in its sur-reply brief where,

after reciting certain language from case law regarding ambiguous contract terms,

Inline simply states: "the provision in the 2006 Supply Agreement for the

repayment of the balance owed to Reynolds is inadequate and ambiguous.

Therefore, its meaning, is not a question of law for resolution by the court." (Def.

Sur-Reply, at 10.) Nowhere in any of its briefs does Inline offer any persuasive

argument as to how this language itself can be read to be ambiguous, even reading

it within the context in which it was written. Instead, Inline seems to assume that

the ambiguity that it claims to exist in the agreement is somehow obvious or

otherwise self-evident and that the Court will therefore proceed to engage in a

review of a variety of parol evidence that Inline believes might cause the Court to

understand the terms of the agreement differently than the way they are actually

written.[6] But the Court finds that an analysis of extrinsic evidence to determine

---

[6] The evidence that Inline urges the Court to consider includes the parties' historical course of dealing, prior drafts of the supply agreement, certain correspondence exchanged between the parties, and a sworn affidavit. Perhaps the most potentially interesting or arguably probative parol evidence that Inline has identified is the fact that Inline allegedly bargained for the removal of a payment acceleration clause that was contained in Reynolds's first proposed draft of the 2006 Supply Agreement. But although this fact may be interesting, it has no bearing on the interpretation of the language that was ultimately used because that language does not admit of the ambiguity that Inline insists upon. Having found no ambiguity in the language that the parties actually used in the provision and in the remaining provisions of the contract, and finding nothing in the 2006 Supply Agreement itself to suggest that the quarterly repayment provision somehow extended beyond the termination of the agreement itself, the Court finds that it would be inappropriate under well-settled law to reach parol evidence to aid in the interpretation of contractual language that is simply not ambiguous.

the meaning of the contract's terms is unwarranted and inappropriate given that there is no ambiguity in the actual language that the parties ultimately elected to use in the contract itself.

For the foregoing reasons, we recommend that the Court decline Inline's invitation to consider parol evidence in order to interpret the repayment provisions contained in the 2006 Supply Agreement. There is no dispute that Inline remains indebted to Reynolds for a significant sum of money arising out of the parties' longstanding commercial arrangements. That relationship came to an end, with Inline continuing to owe Reynolds millions of dollars in unpaid receivables. Although Inline has continued to remit payments to Reynolds on a quarterly basis, calculated using an alleged average based upon past purchase amounts, nothing in the 2006 Supply Agreement or any other contract provides that Inline is entitled to pay its debt in this way. Inline's argument that the language of the 2006 Supply Agreement, and paragraph 5 thereof in particular, is ambiguous is unpersuasive. The language is not ambiguous, and in no event admits of the interpretation that Inline urges the Court to read out of the words actually used. It would therefore be inappropriate to consider the variety of extrinsic evidence that Inline proffers in support of its particular interpretation or to demonstrate its understanding of what the contract allowed. For these reasons, we recommend that the Court grant

Reynolds's motion for summary judgment with respect to its claims for relief under the contract, and direct that Inline make payment on its undisputed debt to Reynolds without further delay.

## B.    Inline's Counterclaim

Inline has asserted a counterclaim, alleging that a contract between the parties arose after July 1, 2008, under which Reynolds was obligated to supply OPS to Inline until January 2009.  Inline claims that Reynolds refusal to supply product after October 8, 2008, caused Inline to incur damages.  Inline has supported its claim that a contract arose through email correspondence between officials for both parties, and by the deposition testimony of William Coad, Reynolds's president.

Characterizing it as nothing more than a makeweight, Reynolds disputes Inline's counterclaim, arguing that although Reynolds agreed to supply Inline's requirements for OPS products between June and October 2008, it made no commitment to supply product thereafter.  Reynolds contends that the fact that it did supply product to Inline between June and October is insufficient to serve as evidence that Reynolds intended to do so in the future.  Furthermore, Reynolds notes that even though Inline claims that it paid valuable consideration to Reynolds through October 8, 2008, the payment of preexisting debts cannot serve

as consideration for a new contract, and past orders cannot constitute consideration for a promise to honor orders placed in the future. Finally, Reynolds notes that Inline seeks only consequential damages for the alleged breach, and Reynolds argues that Inline cannot sustain this claim because there is no evidence that Reynolds had any reason to know what losses Inline might sustain as a result of Reynolds failure to deliver product, even if Reynolds were obligated to do so.

While Inline's reliance on this exchange of correspondence may be a thin reed, and may not carry Inline's ultimate burden of persuasion here, we find at this stage of proceedings that Inline's presentation raises sufficient disputed factual issues regarding this counterclaim, and its position that a contract was, in fact, formed obligating Reynolds to supply Inline with product through January, to defeat a summary judgment motion. See American Eagle Outfitters v. Lyle &Scott Limited, 584 F.3d 575 (3d. Cir. 2009)(exchange of correspondence sufficient to create contract, albeit ambiguous contract, between parties). Inline has offered some limited evidence to support its counterclaim. The record reflects that top-level officials from Reynolds and Inline corresponded regularly between July 2008 and into October 2008, when Reynolds announced that it would discontinue further supply until Inline satisfied its outstanding indebtedness. During this period of correspondence, Reynolds indicated a willingness and ability to continue

supplying OPS to Inline based upon Inline's needs, provided those needs were

communicated with sufficient notice. Although the correspondence indicates that,

at least initially, Inline did not expect to need supply past October, the company

subsequently informed Reynolds that its supply needs might extend through the

end of 2008 and into January 2009.[7] The email exhibits that Inline has provided,

which Inline relies upon substantially to prove its claim that a subsequent contract

arose between the parties, may indicate that Reynolds agreed to continue

supplying OPS product during this period of time.[8] Reynolds's president, William

Coad, acknowledged the correspondence during his deposition, although he does

not appear to have provided much information beyond that contained in the

correspondence.

---

[7] Although Inline's counterclaim alleges that Reynolds was obligated to supply product through January 2009, the correspondence upon which Inline seems to rely indicates that Inline did not expect to require any product from Reynolds after December 2008, although in August 2008, Inline did suggest that its needs for January supply might be adjusted upward.

[8] For example, Reynolds's president, William Coad stated the following in an email that he sent to Inline on August 20, 2008: "We will be able to meet your November volume requirement – we can continue beyond that if we have volume forecasts – I just need advance time to plan capacity curtailment." (Answer, Ex. B.) In response, Tom Orkisz, acting for Inline, responded by noting Inline's OPS needs for September (2.2 MM lbs.), October (2.3 MM lbs.), November (2.3 MM lbs.), December (1.1 MM lbs.), and January (0 MM lbs.). (Id.) Mr. Orkisz also noted that Inline's needs for December and January might need to be adjusted, and he requested guidance with respect to how much notice Reynolds would require to accommodate any changes for these months. (Id.) The record supplied by the parties does not reveal that Reynolds responded to this question, and Mr. Coad could not recall whether he followed up on this issue with Mr. Orkisz. (Doc. 55, Ex. B, Affidavit of William Coad, at 50.)

Whether a contract has arisen between two parties generally presents a question of fact, particularly where the record contains conflicting evidence regarding intent.  See Channel Home Centers v. Grossman, 795 F.2d 291, 300 (3d Cir. 1986) ("Under Pennsylvania law, when the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact.") (citation omitted).  We are constrained to note our view that the evidence upon which Inline seeks to rely to prove the existence of a contract is especially thin, particularly with respect to whether there was consideration to support the alleged agreement.  Nevertheless, following review of the correspondence exchanged over a period of months during which the parties continued to do business and to discuss on a regular basis the costs of product and Inline's need for supply as it worked to transition to a new supplier, together with correspondence from Reynolds that might support a finding that Reynolds had committed itself to meeting Inline's OPS requirements through at least December 2008, we conclude there remains a sufficient question of fact that cannot be resolved on summary judgment.  To the extent that the parties disagree with our characterization of this counterclaim, or the evidence offered in support of the competing viewpoints on whether a contract was formed, they will have occasion to make these arguments to the District Court within the specified periods for

filing objections.  In our view, however, Inline has managed to create a sufficient dispute of fact regarding its counterclaim so as to survive summary judgment on this aspect of the lawsuit alone.

## VI.    **RECOMMENDATION**

For the reasons set forth above, it is RECOMMENDED that Reynolds' motion for summary judgment (Doc. 28) be GRANTED with respect to Reynolds's contract claims and DENIED with respect to Inline's counterclaim.

The parties are further placed on notice that pursuant to Local Rule 72.3:

 Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 1st day of February, 2010.

*S/Martin C. Carlson*
**United States Magistrate Judge**