## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **REYNOLDS PACKAGING KAMA, INC., f/k/a ALCOA KAMA INC.,** | : : : : | **Civil Action No. 3:08-CV-1902** |
| **Plaintiff,** | : : | |
| **v.** | : : | **(Magistrate Judge Carlson)** |
| **INLINE PLASTICS CORP.** | : : | |
| **Defendant.** | : | |

## OPINION

### I.    Statement of Facts and of the Case

#### A.    Procedural History

This case comes before the Court for resolution of the final disputed factual issues and contested legal claims advanced by the parties.  This litigation, which draws to a close with this opinion, began on October 15, 2008 when the plaintiff, Reynolds Packaging KAMA, Inc., brought a breach of contract action against the defendant,  Inline Plastics Corporation, in order to recover unpaid amounts claimed to be due and owing under a series of written, long-term supply agreements between the parties. (Doc. 1)  Specifically, Reynolds' complaint alleged that Inline was a long-term customer of Reynolds, a manufacturer of oriented polysterene sheet ("OPS") and polyethylene terephthalate sheet ("PET") , plastic products which were used in a

variety of business applications.  Over a span of years, Inline, which manufactured plastic containers for retail sales of food products, purchased large quantities of oriented polysterene sheet OPS and PET from Reynolds, pursuant to a series of written supply agreements between the parties. (Id.)  According to Reynolds' complaint, Inline had received, but not paid for, approximately $3,000,000 in goods under these supply agreements when the last of these written agreements expired in the summer of 2008. (Id.)  Reynolds sought reimbursement of these moneys, which it alleged were due and owing under its written contracts with Inline. (Id.)

On December 12, 2008, Inline filed an answer and counter-claim in this contract action. (Doc. 11)  In its answer, Inline acknowledged that it had enjoyed a contractual supply relationship with Reynolds under a series of written agreements which extended until June 30, 2008, when the last, fully-integrated written supply agreement between the parties expired. (Id.)  Inline, however, asserted a counter-claim against Reynolds for actions which allegedly occurred after those written agreements terminated in June of 2008. (Id.)  According to Inline's counter-claim, Inline and Reynolds entered into an interim supply agreement which was embodied in a series of oral and written e-mail communications in the summer of 2008. (Id.) Inline alleged that under the terms of this interim agreement Reynolds committed to providing Inline with plastic for its manufacturing operations through the end of 2008, as Inline made

arrangements for a new long-term source of supply for these materials. (Id.) Inline alleged in its counter-claim that Reynolds breached this agreement by suddenly terminating this supply relationship in October of 2008, and Inline sought damages for the injuries it alleged that it suffered due to this unexpected interruption in its plastics supplies. (Id.)

Reynolds then moved for summary judgment, both on its contract claims against Inline based upon the written agreements between the parties, and on Inline's counter-claim assertion that these parties had entered into an interim supply agreement embodied through a string of communications. (Doc. 28) On February 1, 2010, we issued a report and recommendation which recommended that summary judgment be granted in favor of Reynolds on its contractual claims against Inline, claims which were based on the terms of fully-integrated written supply contracts between the parties. (Doc. 61) As for Reynolds' motion for summary judgment with respect to Inline's counter-claim, which alleged that a less formal and structured interim supply contract had existed between these parties in the summer and fall of 2008, we recommended that summary judgement be denied since there were contested, and unresolved, material issues of fact concerning the course of dealings between the parties which precluded the entry of judgment in favor of Reynolds as a matter of law.(Id.)

3

On March 17, 2010, the district court entered an opinion and order adopting this report and recommendation. (Doc. 65) Following further pre-trial proceedings before the district court, in May of 2011, the parties consented to have the remaining issues in this litigation tried by this Court in a non-jury trial. (Doc. 95)  As defined by the parties, those remaining issues which must be resoled by this Court, are threefold: First, the parties dispute the amount owed by Inline on Reynolds' contract claim, with Reynolds alleging that the total sum owed under this contract was $63,000 greater than the amounts originally agreed to by the parties.  Second, the parties disputed factual issues that were central to Inline's contractual counter-claim, and specifically contested whether there was any enforceable interim supply agreement between the parties after June 2008, which had been breached through Reynolds' refusal to sell additional products to Inline after October 2008.  Finally, the parties contested the amount of any damages to Inline that could be attributed to any alleged breach of this agreement by Reynolds.

With the remaining issues in this case framed by the parties in this fashion, the Court conducted a non-jury trial in this case on August 31, 2011. (Docs. 103, 104 and 105)  Our factual findings and legal conclusions as to these disputed issues follow.

4

## B.    Factual Findings

### 1.    Inline's Counter-Claim

With respect to Inline's counter-claim, we make the following findings of fact:

In the summer of 2008, the longstanding supply agreement between Reynolds and Inline drew to a close. (Tr. 11-12, 108-9.[1])  That contractual relationship had been embodied in a series of written agreements, most recently a 2006 supply agreement which expired on June 30, 2008. (Id., Pl. Ex. 1 and 2.)  Under the terms of this 2006 supply agreement, Inline agreed to purchase products from Reynolds at highly favorable rates. (Pl.Ex. 2.)  The written agreement which was scheduled to expire in June 2008 also addressed an on-going issue between the parties–Inline's substantial indebtedness to Reynolds arising out of prior purchases. (Pl.Ex. 2.)  Indeed, by the summer of 2008 this outstanding indebtedness was substantial, amounting to approximately $3.2 million.(Id., Pl. Ex. 1 and 2.)  Under the terms of the written agreement, in order to address Inline's outstanding debt, the 2006 Supply Agreement contained a provision intended to help Inline pay down the debt incrementally by including an upcharge on new product purchased each quarter. (Pl. Ex. 2, 2006

---

[1]These transcript references are references to the August 31, 2011, trial transcript. (Doc. 106.)

Supply Agreement ¶ 5.)  Specifically, this provision, which also expired along with

the supply agreement, provided as follows:

> To bring [Inline's] account current, [Inline] will pay [Reynolds],
> quarterly, an additional $.03 per pound for all pounds of Product
> purchased during each quarter . . . This payment will be applied to the
> outstanding receivables on [Inline's] account.

(Id.)

As their longstanding business relationship drew to a close, Reynolds and Inline

had markedly different business interests and priorities.  From Reynolds' perspective,

one of its highest priorities was reaching a new agreement concerning the repayment

of this multi-million dollar receivable owed by Inline, since the termination of the

existing supply agreement also terminated the contractual means by which Inline was

repaying this debt. (Tr. 103-120.)  This issue of debt repayment was a pre-eminent

concern for Reynolds, and the ability to make future interim sales to Inline in the Fall

of 2008 was a matter of lesser concern to Reynolds since Reynolds had determined

by the Summer of 2008 that Inline's historic line of business had actually not been

profitable for Reynolds. (Tr. 103-120.)

In contrast, as their longstanding contractual relationship drew to a close Inline

had other priorities. (Tr. 14-29.)  Inline's principle focus was on securing a short-term

interim source of supply from Reynolds as it transitioned to a new long-term supply

source.  (Tr. 14-29.)   As for its outstanding indebtedness to Reynolds, while Inline

acknowledged this debt, it was unable to provide Reynolds with any specific assurances regarding how that looming debt would be paid. (Tr. 64-65.)

Moreover, it is evident from the trial testimony of the two principals for Reynolds and Inline, William Coad and Thomas Orkisz, that neither Mr. Coad nor Mr. Orkisz fully appreciated how different, and divergent, their corporate interests, needs and priorities were as this supply agreement drew to a close and the parties engaged in discussions regarding an interim relationship. (Tr. 14-29, 103-120.)  Thus, the parties approached these discussions through the prisms of two very different perspectives, and with mutual misunderstandings regarding their respective needs and priorities. (Tr. 14-29, 103-120.)  The confusion which these different, and mutually unappreciated, expectations created would compound over the next four months. (Tr. 14-29, 103-120.)

The discussions between the parties regarding this interim relationship began on June 25, 2008, when William Coad, the President of Reynolds, wrote to Thomas Orkisz, Inline's President. (Pl.Ex. 3.)  In this June 25, 2008 letter Reynolds provided Inline with revised pricing for interim supplies of plastic materials as Inline transitioned to a new long-term supply source. (Id.)   However, Mr. Coad's correspondence also spoke to what was then Reynolds' most pressing priority,

repayment of the $3.2 million debt owed by Inline, and proposed a one-year repayment schedule for this debt, with interest. (Id.)

On July 3, 2008, Thomas Orkisz, acting on behalf of Inline, responded to this proposal in an e-mail communication. (Pl.Ex. 4.) Orkisz's reply reflected Inline's very different priorities in this business relationship. (Id.) Mr. Orkisz made no mention of repayment of the outstanding $3.2 million debt owed to Reynolds, one of the principle issues set forth in Mr. Coad's June 25, 2008 proposal.(Id.) Instead, Mr. Orkisz sought further price concessions from Reynolds on his primary, concern the interim supply proposal. (Id.) While the parties addressed those pricing issues in a series of subsequent e-mail communications, (Pl. Ex 5), Reynolds' concerns regarding the establishment of some fixed repayment schedule of Inline's $3.2 million indebtedness remained a pending, and unaddressed, issue from Reynolds' perspective. (Tr. 103-120.)

Thus, on July 14, 2008, William Coad wrote to Thomas Orkisz in an e-mail communication which discussed the interim supply agreement between the parties but once again expressly linked those discussions to a "need to confirm the repayment schedule for Inline's outstanding balance." (Pl. Ex. 6. ) Ten days later, on July 24, 2008, Orkisz replied to this communication in a fashion which reflected a continued lack of understanding on Orkisz's part regarding Reynolds' need for a fixed

8

repayment schedule for this $3.2 million debt.(Pl. Ex. 6. )   Indeed, Orkisz's July 24, 2008, response did not speak to this issue in any fashion. (Pl. Ex. 6.)  Instead, Orkisz, whose priorities revolved around meeting Inline's interim supply needs, simply outlined those needs for Coad without addressing repayment of this outstanding debt. (Id.)

Reynolds' demands for repayment of this outstanding $3.2 million debt, however, remained a recurring theme in conversations between the parties between June and October, 2008. (Tr. 47, 48, 60, 64-65, 103-120.)  In at least some of these discussions, Inline's President, Thomas Orkisz, indicated that he was exploring proposals which would achieve Reynolds' principle stated objective, prompt repayment of this substantial debt.  As Mr. Orkisz testified:

> I think, you know, from the period of the end of June [2008] through that point [October 2008], there was probably at least, you know, three or four conversations over the summer of this topic [repayment of the $3.2 million debt]. In some instances I probably told Bill [Coad, Reynolds' President] I was looking into it, looking at options, talking to my bank to see if we could accelerate it. There might even been some thought about maybe compromising it we could pay it off quickly but a lesser amount. You know you're talking three years ago. But there were some things kicked around.

(Tr. 64.)

Ultimately, however, Mr. Orkisz concluded that: "One constant that we pretty much landed on [was] not believing we could do anything better and an historical quarterly

9

rate of about 250 to 300K." (Tr. 64-5.)  Thus, the final proposal advanced by Mr. Orkisz on the issue of primary importance to Reynolds in these negotiations, repayment of the outstanding $3.2 million debt, was a proposal to pay the principal owed, without interest, in quarterly installments of approximately $250,000.[2] (Id. )

While the parties pursued these on-going discussions regarding payment of the debt owed to Reynolds, Inline continued to press forward with its business priority, obtaining an interim source of supply from Reynolds through the end of 2008, while Inline transitioned to other long-term supply sources.  In that regard, on August 19 and 20, 2008, Mr. Orkisz and Mr. Coad engaged in an exchange of e-mails regarding Inline's forecasted requirements through November 2008. (Pl Ex. 7 and 8.)  In response to Mr. Orkisz's forecasts on behalf of Inline, Mr. Coad replied that Reynolds would: "be able to meet your November volume requirement–we can continue beyond that if we have volume forecasts". (Pl. Ex. 8.)

Each of the principals to this exchange freighted their August 2008 e-mail exchange with significantly different meanings.  For Mr. Coad, acting on behalf of Reynolds, the e-mail simply was meant to convey that Reynolds had the capacity to meet Inline's interim needs provided that all of the outstanding issues actively being

---

[2]We note that this proposal would, in essence require more than three years to discharge this debt, and would, in effect, become an interest free three year $3.2 million loan from Reynolds to Inline.

discussed between the parties– and most particularly the $3.2 millions debt– were resolved. (Tr. 118-119.) In contrast, Mr. Orkisz construed Reynolds' statement that "We will be able to meet your November volume requirement– we can continue beyond that if we have volume forecasts," (Pl. Ex. 8), as a free-standing commitment to continue to make sales to Inline, even if Inline did not agree to a repayment schedule of its outstanding $3.2 million debt. (Tr. 23-27.)

This mutual misunderstanding persisted between the parties until early October when Coad and Orkisz had a discussion regarding repayment of this debt, an issue that had been lingering unresolved between Reynolds and Inline since June, 2008. In the course of that discussion Mr. Coad came to understand that Inline's position with respect to this debt ultimately was that it could only pay the principal owed, without interest, in quarterly installments of approximately $250,000, a position which was unacceptable to Reynolds. (Tr. 64-65, 119-120.)

Informed of Inline's position on this significant outstanding issue between the parties, Mr. Coad wrote to Inline's President, Mr. Orkisz, as follows:

> Tom, we have reviewed the options we discussed yesterday and they are not acceptable to Reynolds Packaging. The need for a repayment schedule for the $3.1 million outstanding balance has been discussed with you since our contract ended on June 30, 2008. A proposed repayment schedule was sent to you in a letter from me on June 25, 2008. In the absence of an agreed upon repayment plan we must take the following actions effective October 10th:

11

> 1) All shipments of plastic sheet from Reynolds Kama to Inline will be discontinued– orders will not be accepted effective today.
>
> 2) We will initiate Legal action to recover all monies owed to Reynolds Food Packaging/Kama by Inline.
>
> I am available today and Thursday to discuss any specific proposals you may wish to bring forward.

(Pl. Ex. 9.)

Despite Mr. Coad's closing that he was "available today and Thursday to discuss any specific proposals you may wish to bring forward," Mr. Orkisz never replied to this e-mail. (Tr. 33.)  Instead, Inline construed this message as tantamount to a refusal by Reynolds both to accept new orders and to fulfill pending orders.(Tr. 29-33.)  Construing the message in this fashion, Inline canceled all of its existing orders with Reynolds, and sought supplies elsewhere. (Id.)  This reaction by Inline served to further highlight the depth of the mutual misunderstanding between the parties in October 2008, since Reynolds had only intended to refuse future supply orders from Inline, but stood ready to complete pending orders. (Tr. 119-120.)  Thus, when Inline canceled its pending orders, Reynolds construed this action as a irretrievable breach of this business relationship and commenced this lawsuit.

Inline, in turn, began undertaking efforts to meet its short-term supply needs in others fashions.  As a result of these efforts, caused by what Inline characterizes as Reynolds' breach of its agreement to serve as an interim supplier to Inline through

2008, Inline alleges that it suffered various damages totaling $349, 752. [3] (Tr. 75-88,

D.Ex. 2.)

### 2.      Loss Calculation on Reynolds' Breach-of-Contract Claim

With respect to the issue of the losses claimed by Reynolds on its breach-of -

contract claim, the Court makes the following findings of fact:

Following the filing of this complaint, Inline proposed, over Reynolds'

objection, to continue to make quarterly payments of monies owed under this contract.

(Docs.  19, 20, 21 )  On April 7, 2009, this Court, Blewitt, M.J., directed that such

payments be made directly by Inline to Reynolds while this lawsuit was pending.

(Doc. 23)

As the parties proceeded to litigation of the summary judgment motion filed by

Reynolds in this contract dispute, they were able to quantify with precision the total

amount of this outstanding indebtedness on this contract stating that "Inline admits

that it owes Reynolds the amount of $2,792,860.02 as of March 21, 2009." (Doc. 33,

p.2)  Inline then continued to make quarterly payments reducing this acknowledged

---

[3]These damages included the estimated lost profits on back orders that were
shipped late, or not shipped; additional incremental freight charges for late
shipments; direct charge backs owed by Inline to certain customers for late
shipments; and an estimate of overall business lost due to this interruption in
supplies. (Tr. 75-88, D.Ex. 2.)

indebtedness until April, 8, 2011, when Inline made a final $307, 162 installment payment to Reynolds which Inline reported to Reynolds "complete[d] Inline's payable obligations to Kama." (Tr. 66-74, D.Ex. 14[4].)

Reynolds did not directly dispute Inline's mathematical assessment that full payment had been completed on this contract when Inline paid this sum in April 2008. Instead, Reynolds first challenged the calculation of this total debt in one narrow respect at trial. Calling Christopher Smith, a senior accounting manager for Reynolds, as a witness, Reynolds presented evidence which indicated that there was an additional $63,000 owed to Reynolds on Inline's account. (Tr. 132-149.) Mr. Smith reached this conclusion based solely upon a review of computerized accounting records which showed that there were three unpaid invoices to Inline on Reynolds' accounting records from 2004. (Tr. 136.) However, Mr. Smith had no personal knowledge regarding any of these 2004 invoices; acknowledged that Reynolds' accounting systems had been automated several times since 2004; conceded the possibility of data entry errors in these records; and agreed that Inline had disputed some invoices. (Tr. 139-148.)

## II.   **Discussion**

---

[4]In fact, at the trial of this case the parties agreed with the Court's arithmetic observation that it appeared that Inline still owed 50 cents to Reynolds, a debt which is not material to resolution of these claims. (Tr. 73.)

### A.      Legal Principles Governing Construction of Contracts

As a federal court exercising diversity jurisdiction in this case, we are obliged to apply the substantive law of Pennsylvania to this dispute. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d. Cir. 2000).  The legal principles governing the interpretation of contracts under Pennsylvania law is familiar and well-settled.  At the outset, the issue of whether a contract has arisen between two parties generally presents a question of fact, particularly where the record contains conflicting evidence regarding intent.  See Channel Home Centers v. Grossman, 795 F.2d 291, 300 (3d Cir. 1986) ("Under Pennsylvania law, when the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact.") (citation omitted).

Furthermore, the legal benchmarks applied to different types of agreements–oral and written–are also clearly settled.  Initially, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone."  Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1010 (3d Cir. 1980) (citation omitted); Mace v. Atl. Ref. & Mktg. Corp., 785 A.2d 491, 496 (Pa. 2001).  A contract is ambiguous if it is reasonably susceptible to different constructions and capable of being understood in more than one sense.  St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991).  Under Pennsylvania law, ambiguous contracts

15

are interpreted by the trier of fact, and unambiguous contracts are interpreted by the court as a matter of law. Mellon Bank, 619 F.2d at 1011 n.10.

The United States Court of Appeals for the Third Circuit has aptly summarized Pennsylvania law regarding the interpretation of contractual language and terms:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 243 (3d Cir. 2008) (internal citation omitted) (citing Murphy v. Duquesne Univ., 777 A.2d 418, 429-30 (Pa. 2001)). Furthermore, courts must, whenever possible, read contract provisions so as to avoid ambiguity. Id. at 247. Where a contract is not ambiguous, but is instead subject to only one reasonable interpretation, it is appropriate for a district court to

16

resolve the issue of interpretation as a matter of law.  See Norfolk S. Ry. v. Reading Blue Mountain & N. Ry., 346 F. Supp. 2d 720, 725 (M.D. Pa. 2004).  However, when a party argues that a contract is sufficiently ambiguous to require parol evidence, that party must advance an alternate meaning of the contract which is commercially reasonable.  See County of Mercer v. Unilect Corp., 612 F.Supp.2d. 638, 649 (W.D. Pa. 2009)(collecting cases).  Further, under Pennsylvania law, agreements must satisfy the following three requirements to be enforceable: (1) both parties must manifest an intent to be bound by the terms of the agreement; (2) the terms must be sufficiently definite to be enforceable; and (3) the agreement must be supported by consideration.  ATACS Corp. v. Trans World Commc'ns., Inc., 155 F.3d 659, 666 (3d Cir. 1998) (internal citations omitted).

In making this determination, the pivotal inquiry is whether the parties "manifested an intention to be bound by [the agreement's] terms and whether the terms are sufficiently definite to be specifically enforced." ATACS Corp., 155 F.3d at 665(internal citations omitted).  Thus, in order to form a contract there must be an offer, acceptance, consideration, or mutual meeting of the minds. Aircraft Guaranty Corp. v. Stro-Lift, Inc., 103 F. Supp. 2d 830, 835-36 (E.D.Pa. 2000) (citing Jenkins v. County of Schuylkill, 658 A.2d 380,383 (Pa. Super. 1995).  "A 'meeting of the minds' occurs when both parties mutually assent to the same thing, as evidenced by

an offer and acceptance." Id. (citing Management Systems, Inc. v. Consolidated Recycling and Transfer Systems, Inc., 617 A.2d 1140, 1146 (Pa. Super. Ct. 1996).

In this case we are presented with a business, and Inline contends, contractual relationship which is premised on an exchange of e-mails coupled with other oral communications.  While in some instances an exchange of e-mails, and other oral communications between parties, may be sufficient to establish a contract, see American Eagle Outfitters v. Lyle & Scott Limited, 584 F.3d 575 (3d Cir. 2009)(exchange of correspondence sufficient to create contract, albeit ambiguous contract, between parties), such exchanges do not always rise to the level of enforceable agreements.  Rather, under Pennsylvania law, certain basic principles govern the interpretation of contracts which consist of separate written and oral communications.  Thus, when applying Pennsylvania law:

> To establish that it had an oral contract [a party] must show that: 1) both parties manifested an intention to be bound by the terms of the agreement; 2) the terms of the agreement were sufficiently definite to be specifically enforced; and 3) there was mutuality of consideration. Redick v. Kraft, Inc., 745 F.Supp. 296, 300 (E.D.Pa.1990) (applying Pennsylvania law). The requirement of consideration is satisfied if there was a benefit conferred on the promisor or a detriment to the promisee and "an act, forbearance or return promise bargained for and given in exchange for the original promise." Channel Home Centers, Grace Retail v. Grossman, 795 F.2d 291, 299 (3d Cir.1986). [Furthermore], "The existence and terms of an oral contract must be established by clear and precise evidence." Redick, supra, 745 F.Supp. at 300. Whether a contract exists is a factual issue for the trier of fact to determine unless there is no

18

genuine issue of material fact.

York Excavating Co., Inc. v. Employers Ins. of Wausau,  834 F.Supp. 733, 740 (M.D.Pa.1993).

In determining whether the parties "manifested an intention to be bound by [an agreement's] terms and whether the terms are sufficiently definite to be specifically enforced," ATACS Corp., 155 F.3d at 665(internal citations omitted),  Pennsylvania courts agree that "[a]n agreement to agree is incapable of enforcement" Highland Sewer and Water Auth. v. Forest Hills Municipal Auth., 797 A.2d 385, 390 (Pa. Commw. Ct. 2002).  Thus, the mere statement of an aspirational goal to reach some future agreement is not an enforceable contract in Pennsylvania. Channel Home Centers v. Grossman, 795 F.2d 291,  298 (3d Cir. 1986).  However, when construing what may be inartfully crafted or incomplete agreements, it is also clear that"the omission of an essential term in a contract, such as price, does not [necessarily] vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of the agreement are sufficiently definite." ATACS Corp., 155 F.3d at 667.  Quite the contrary, "it is well settled that the terms of a contract need not be expressed with complete exactness," Conrail v. Canada Malting Co., No. 98-5984, 2000 U.S. Dist. LEXIS 1273, at *26 (E.D. Pa. Feb. 10, 2000) and "Courts generally disfavor the destruction of contracts [merely] because of uncertain terms."

19

Id. (citations omitted).  Applying these principles, when confronted with an inartful or incomplete agreement courts are encouraged to "if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained.'" Id. (citations omitted).  However, in all instances where we are applying Pennsylvania law and interpreting oral agreements, " 'The existence and terms of an oral contract must be established by clear and precise evidence' Redick, supra, 745 F.Supp. at 300, [and] whether a contract exists is a factual issue for the trier of fact to determine . . . ." York Excavating Co., Inc. v. Employers Ins. of Wausau, 834 F.Supp. at 740.

Furthermore, agreements, like the agreement alleged by Inline in this case, which consist of fragmentary oral and written exchanges, are frequently sufficiently uncertain and ambiguous that they require consideration of extrinsic evidence to determine what understandings, if any existed between the parties. See American Eagle Outfitters v. Lyle &Scott Limited, 584 F.3d 575 (3d. Cir. 2009)(exchange of correspondence sufficient to create factual issue regarding whether contract, albeit ambiguous contract, existed between parties).  When addressing these factual issues, we are called upon to consider the competing evidence and ascribe the most commercially reasonable interpretation to the parties' words and  actions. See Glenn Distributors Corp. v. Carlisle Plastics, Inc. 297 F.3d 294, 301 (3d Cir. 2002).

20

**B.** **Inline Has Failed to Carry Its Burden of Proof on Its Contract Counter-claim**

Judged against these benchmarks, we find that Inline has failed to carry its burden of proof regarding the keystone to its counter-claim, the existence of an enforceable interim supply contract between the parties in the Fall of 2008. Recognizing that under Pennsylvania law agreements must satisfy the following three requirements to be enforceable– (1) both parties must manifest an intent to be bound by the terms of the agreement; (2) the terms must be sufficiently definite to be enforceable; and (3) the agreement must be supported by consideration. ATACS Corp. v. Trans World Commc'ns., Inc., 155 F.3d 659, 666 (3d Cir. 1998)–we find that Inline's proof simply does demonstrate that Reynolds and Inline manifested an intention to be bound by a single agreement. Quite the contrary, we find that the communications between the parties here, which were sporadic and consisted of both written and oral exchanges, reflected a series of mutual misunderstandings rather than manifesting a single shared intention to be bound by an agreement.

It is evident that, from the outset of its discussions, Reynolds was linking an interim supply agreement with Inline to its principle concern, prompt repayment of a $3.2 million debt owed by Inline. Thus, Reynolds repeatedly raised these two issues in conjunction with one another;  plainly sought to address both of these issues in its

negotiations; and abandoned these discussions when it became apparent that Inline was unwilling or unable to satisfactorily address the concern which it had raised at the outset of these talks and had pursued through these discussions–prompt debt repayment.  We find, therefore, that from Reynolds' perspective, satisfaction of this $3.2 million debt was a material element of any contract.  We further find that Reynolds manifested that intention on multiple occasions, making it clear that agreement on repayment terms was a material element of any on-going business relationship between the parties.  Accordingly, since the parties never reached a single shared intention on this material aspect of their negotiations, we find that they never entered into an enforceable interim supply agreement.

In reaching this conclusion we recognize that Inline places great weight on Reynolds' assertion in an August 20, 2008 e-mail that  Reynolds would "be able to meet your November volume requirement–we can continue beyond that if we have volume forecasts" (Pl. Ex. 8) as evidencing an irrevocable commitment to supply products regardless of any debt repayment.  However, from our perspective, the problems with this contention are two-fold.

First, this argument relies upon a single comment by Reynolds devoid of the broader factual context of the business dealings between the parties.  That factual context reflects that, even as Reynolds was stating it had the capacity to meet these

needs, it was concurrently pressing Inline for a commitment to repay its multi-million

dollar debt.  Furthermore, the context of this communication reveals that Inline was

representing to Reynolds that it was exploring means of achieving that very goal.  As

Inline's President, Thomas Orkisz, testified:

> [F]rom the period of the end of June [2008] through that point [October
> 2008], there was probably at least, you know, three or four conversations
> over the summer of this topic [repayment of the $3.2 million debt]. In
> some instances I probably told Bill [Coad, Reynolds' President] I was
> looking into it, looking at options, talking to my bank to see if we could
> accelerate it. There might even been some thought about maybe
> compromising it we could pay it off quickly but a lesser amount. You
> know you're talking three years ago. But there were some things kicked
> around.

(Tr. 64.)

Thus, it is evident from the testimony of Inline's President, that he was initially

suggesting to Reynolds that he both understood their need for prompt repayment of

this $3.2 million debt and was exploring means to achieve that repayment.  Placed in

this broader factual context, where Inline admits that it was informing Reynolds that

it "was looking into [debt repayment], looking at options, talking to [the] bank to see

if we could accelerate it," this single statement by Reynolds cannot reasonably be

viewed as a binding commitment to supply Inline even if Inline refused to timely

repay its $3.2 million debt.

More fundamentally, the interpretation of this statement which Inline urges upon us runs afoul of one of the guiding principles we must apply when interpreting ambiguous agreements; namely, that a party's interpretation of ambiguous language must be commercially reasonable. See e.g., Glenn Distributors Corp. V. Carlisle Plastics, Inc. 297 F.3d 294, 301 (3d Cir. 2002); County of Mercer v. Unilect Corp., 612 F.Supp.2d. 638, 649 (W.D. Pa. 2009)(collecting cases).  Here, the interpretation proposed by Inline asks us to find that Reynolds decided to act in a commercially unreasonable fashion by unilaterally electing to supply Inline, even though Inline refused in any meaningful way to address Reynolds' oft-stated need for prompt repayment of a $3.2 million debt.  Because Inline's efforts to parse this business relationship into these separate isolated segments which are not dependent upon one another is not commercially reasonable behavior in this setting, we will decline to adopt this interpretation of Reynolds' words and actions in determining whether there was an enforceable agreement between the parties.  We will also decline Inline's invitation to find that there was an enforceable agreement between the parties which would have compelled Reynolds to sell products to Inline even as Inline refused to promptly repay a multi-million dollar debt owed for past goods sold.

Accordingly, for the foregoing reasons we will find against Inline on its counter-claim.[5]

### C.   Reynolds Has Failed to Carry Its Burden of Proof on Its Claims for an Additional $63,000 in Damages on Its Contract Claim

Likewise we find that Reynolds has not carried its burden of proof on its claim that it is owed an additional $63,000 from Inline on the original long-term supply agreements in this case.  As a threshold matter, we note that Reynolds had previously quantified the total amount of this outstanding indebtedness on this contract with precision and in a manner which was inconsistent with its current claims.  Indeed, in 2009 Reynolds flatly stated that "Inline admits that it owes Reynolds the amount of $2,792,860.02 as of March 21, 2009" in its summary judgment pleadings. (Doc. 33, p.2)

---

[5]Having reached this conclusion on the question of whether an enforceable agreement existed here, we need not address in detail Inline's damages claims. We note, however, as a threshold matter, that it is unclear that Inline can collect consequential commercial damages like those it seeks since some of these damages may not have been reasonably foreseeable. See 13 Pa.C.S. § 2715; AM/PM Franchise Ass'n.  v. Atlantic Richhfield Co., 584 A.2d 915 (1990)(only reasonably foreseeable consequential damages may be recovered in contract action).  In any event, Inline's proof at trial of many of the components of those claimed damages, such as lost profits and lost future business, was simply too speculative to carry Inline's burden of proof on these damage claims.

We further note that Inline then made quarterly payments on this acknowledged debt, reducing this indebtedness until April, 8, 2011, when Inline made a final $307, 162 installment payment to Reynolds , a payment which Inline reported to Reynolds "complete[d] Inline's payable obligations to Kama." (Tr. 66-74, D.Ex. 14.) Reynolds accepted this payment without protest and without any demurrer denying Inline's claim that the payment "complete[d] Inline's payable obligations" until shortly before trial.

At trial, Reynolds presented testimony by Christopher Smith, a senior accounting manager for Reynolds, who testified that an additional $63,000 was owed to Reynolds on Inline's account. (Tr. 132-149.) However, Mr. Smith reached this conclusion based solely upon a review of computerized accounting records which showed that there were three unpaid invoices to Inline on Reynolds' accounting records from 2004. (Tr. 136.) Thus, Mr. Smith had no personal knowledge regarding any of these 7 year-old invoices. Smith also acknowledged that Reynolds' accounting systems had been automated several times since 2004, could not exclude the possibility of data entry errors in these records. Furthermore, Mr. Smith agreed that Inline had disputed the validity of some Reynolds' invoices. (Tr. 139-148.) Thus, Reynolds' proof of these additional damage claims rested upon the testimony of a witness who had no direct personal knowledge regarding the background of these 7

26

year-old invoices. This claim was supported by records of uncertain provenance, which were disputed by Inline. Moreover, this loss claim was inconsistent with Reynolds' earlier, and longstanding, loss calculation in this case. Therefore, in our view, this testimony, standing alone, is simply insufficient to carry Reynolds' burden of proving that the longstanding, and mutually acknowledged indebtedness of Inline on this contract had actually been unwittingly miscalculated by all parties for years. Therefore, for the foregoing reasons we will find against Reynolds' on this aspect of its contract claim.

### III.   Conclusion

In accordance with the findings of fact and conclusions of law set forth in this opinion, IT IS ORDERED that:

1.   We find against Inline on its counter-claim.

2.   We find against Reynolds on its contract claim for payment of an additional $63,000 by Inline.

3.   The clerk is directed to close this file.

So ordered this 25th day of October, 2011.

*__S/Martin C. Carlson__*

Martin C. Carlson

United States Magistrate Judge